IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TERRY R. NESVOLD,

                              Plaintiff,                    OPINION AND ORDER

        v.                                                         13-cv-744-wmc

SHERIFF DEAN W. ROLAND and
BURNETT COUNTY,

                              Defendants.

Plaintiff Terry R. Nesvold asserts a First Amendment retaliation claim and a Fourteenth Amendment Due Process claim against his former employer Burnett County and former supervisor Sheriff Dean W. Roland.  In addition to his federal claims, Nesvold also alleges Roland assaulted him in violation of state law.  Before the court is defendants' motion for summary judgment.  (Dkt. #34.)  Because Roland is entitled to qualified immunity for his actions in response to Nesvold's speech and because Nesvold does not have a protected interest in his employment as Jail Administrator, the court will grant judgment to defendants on plaintiff's federal claims.  The court will also decline to exercise supplemental jurisdiction over his state law assault claim, dismissing it without prejudice.

UNDISPUTED FACTS[1]

**A.  The Parties**

Plaintiff Terry R. Nesvold worked as the Burnett County Jail Administrator from approximately August 2003 to February 28, 2013.  Defendant Dean W. Roland is the Sheriff of defendant Burnett County, and was Nesvold's supervisor at all times relevant to this lawsuit.  Burnett County is a government entity organized and existing under the laws of the State of Wisconsin, located in the northwestern part of the state, south of Douglas County, North of Polk County and nestled against the St. Croix River.

**B.  Nesvold's Job Duties**

As the Burnett County Jail Administrator, Nesvold was responsible for overseeing the daily operations of the Burnett County Jail and the Burnett County Dispatch Center. According to Nesvold, his job duties included:  overseeing scheduling; defining policy and procedure; budgeting; coordinating the purchase of equipment; attending meetings with probation judges and state jail administrators; coordinating with jail administrators from other counties; overseeing dispatch, including supervising dispatch personnel; and acting as a liaison between local governmental units.   (Deposition of Terry Nesvold ("Nesvold Depo.") (dkt. #33) 20-22.)  The Jail Administrator job description formally listed certain "essential accountabilities," including: managing and overseeing staff activity as per policy and department goals; reviewing the budget, including accounting for moneys

---

[1]  Except where specifically noted, these undisputed facts are taken from the formal findings and responses submitted by the parties after resolving all disputes and drawing all inferences in favor of the plaintiff as the non-moving party.

spent and revenues received; keeping the general public, staff and inmates safe and secure; initiating new programming with the jail to reduce expenditures, to rehabilitate and to promote positive attitudes of inmates; serving as the contact person for outside entities; overseeing continuous training of staff; overseeing the warrants are entered correctly and timely; and negotiating contracts concerning inmate housing issues. (Affidavit of Dean W. Roland ("Roland Aff."), Ex. 4 (dkt. #37-4).)

### C. Dispatch Center Consolidation

During the period leading up to the events at issue in this lawsuit, the Burnett County Dispatch Center and the Burnett County Jail were combined. This meant that Burnett County employed individuals served in a dual capacity as both Jailer and Dispatcher.

In 2012, Burnett County hired a consultant to study whether Burnett County's Dispatch Center should be consolidated with Polk County's Dispatch Center. (From other facts, the court infers that this consolidation would have required Burnett County to operate the Dispatch Center separately from the Jail.) The County formed a small committee to work with the consultant and provide information. Both Burnett County and Polk County employees provided information to the consultant. Among others, Nesvold spoke with the consultant about how Burnett County ran its Dispatch Center. Both Nesvold and his staff also answered the consultant's question.

Candice Fitzgerald, the Burnett County Administrator/Human Resources Director at that time, reviewed the consultant's report and determined that it was too risky for

Burnett County to continue with a combined dispatch/jail.  Moreover, Fitzgerald also supported consolidation with Polk County's Dispatch Center because of cost savings, separation of duties between jailer and dispatch employees, and problems Burnett County had experienced with its Dispatch Center.

### D. Restriction on Communication with Board Supervisors

At some point, Sheriff Roland complained to Administrator Fitzgerald that employees were speaking directly with County Board Supervisors (or members, the parties use both terms interchangeably) about the consolidation plan.  Roland requested that all County Board Supervisor questions should be routed to him.  In the fall of 2012, Fitzgerald, Roland and Chief Deputy Scott Burns had a meeting in which they agreed that members of the Sheriff's Department should not talk with County Board Supervisors about the consolidation.

In September 2012, Roland also spoke with Nesvold about the potential consolidation and specifically ordered him to not have any contact or communications regarding the proposed consolidation with Board Supervisors or the media.  If contacted, Nesvold was also told to direct any inquiries to Roland.  This order applied to all communications whether or not they occurred outside of work and work hours.

Roland reiterated his directive to Nesvold right before a Board meeting held on or around November 1, 2012.  Specifically, Roland told Nesvold that the consolidation was a "done deal" and to "keep his fucking mouth shut."  (Nesvold Depo. (dkt. #33) 52.)

On November 14, 2012, the County Board Supervisors attended tours of both the Burnett County and Polk County Dispatch Centers.  After the tours, there was a question and answer sessions, at which Nesvold was present.  Roland again reinforced his order not to speak with the County Board Supervisors before the tour.

### E.  Nesvold's Communication with Board Supervisors

These orders not to talk to his elected officials bothered Nesvold.  As described next, Nesvold chose not to obey Roland.

Nesvold sent numerous emails to County Board Supervisors during the time frame of early November 2012 through February 2013, regarding the proposed consolidation. Nesvold also met with County Board Supervisors three or four times outside of the Sheriff's Department, and approximately eight additional times when County Board Supervisors came to his office.  Outside of the office, Nesvold met with County Board Supervisor Gene McLain on approximately November 10, and November 17, 2012, at Nesvold's wife's business, and again in December or January 2013 at Loggers Bar and Grill.[2]  Nesvold also met with County Board Supervisor Dale Dresel in November 2012 at his wife's business.  During those meetings, Nesvold met outside of working hours while he was not in uniform, and while driving his personal vehicle.

_____

[2] At some point, McClain was made aware of the Sheriff's order restricting Nesvold from speaking with Board Supervisors.  Specifically, in a November 19, 2012, email to McClain, Nesvold advised that "[j]ust spoke with the Sheriff, and he does not want me communicating anymore with you.  If you have any questions, he wants you to directly deal with him."  (Nesvold Depo., Ex. 10 (dkt. #33-10).)

Both McLain and Dresel expressed concern about the consolidation proposal, and asked Nesvold to find out some more information for them.  (Nesvold Depo. (dkt. #33) 49-50.)  Nesvold used a jail administrator listserv to obtain certain information, which he described as "factfinding stuff" at his deposition.  (*Id.* at 50.)

At the time Nesvold was communicating with County Board Supervisors, Nesvold knew that he was violating Roland's order.  Nesvold complained to Roland about this order restricting him from speaking to County Board Supervisors, and Roland told him to "shut your fucking mouth."  (*Id.* at 50-51.)[3]

### F.  November Actions

On November 20, 2012, Roland came to Nesvold's office.  According to Nesvold, Roland told him that he was "fucking fired" as the dispatch supervisor.  He also said that Lieutenant Mystie Anton was going to take over supervision of the Dispatch Center. During this brief meeting, Roland was irate, yelling and swearing at Nesvold, which Roland indicated was a result of his just being told that Nesvold was talking to County Board Supervisors regarding the consolidation.[4]  Nesvold felt threated and intimidated by

---

[3] The parties dispute what Roland knew about Nesvold's communications and when he knew it.  Though the record supports a finding that Roland was aware of Nesvold's communications with Board Supervisors, the court need not describe these factual disputes (or the legal issue of causation) because of its conclusion that Roland is entitled to qualified immunity.

[4] Nesvold's testimony about what Roland said is admissible as a statement made by a party opponent.  Fed. R. Evid. 801(d)(2).

Roland, who reiterated that Nesvold was never to talk to the County Board regarding the consolidation issue. After the meeting, Nesvold told his staff that Roland had fired him.

According to Roland, Nesvold was actually told that Anton had recently been promoted and had the job responsibility to oversee the Dispatch Center, but that Nesvold should ensure Anton was doing her job properly. As such, in Roland's view, Nesvold remained in charge of Anton and thus remained in an oversight role over the Dispatch Center. Still, Roland does not dispute that he told Nesvold that he would be working in the Jail, and not in the Dispatch Center.

For his part, Nesvold concedes that before October 1, 2012, a full month and a half before the blow up in his office, Nesvold had already developed a description for a new lieutenant position, whose job duties would include overseeing the Dispatch Center. In conjunction with the creation of this new lieutenant position, Nesvold also had requested and obtained approval to promote Anton to the position from the Administration Committee, a committee of the Burnett County Board, on September 17, 2012, more than two months before the blow up. In fact, Nesvold had announced Anton's promotion in a memo dated September 26, 2012.

Defendants reasonably contend that once Anton was promoted to the new lieutenant position, she was in charge of the Dispatch Center, with Nesvold providing oversight to ensure Anton was properly doing her job. From this, the court might also reasonably infer that Nesvold's position did not materially change after the November 20, 2012, meeting. Still, plaintiff persists in asserting that prior to that meeting,

"Nesvold worked with Anton," and that, presumably, after the meeting, he was no longer allowed to work with her.  (Pl.'s Resp. to Defs.' PFOFs (dkt. #42) ¶ 49.)

On November 29, 2012, Nesvold observed Roland speaking with two other individuals in and near the dispatch center.  Nesvold then heard yelling.  Immediately after, Roland came to his office, slammed the door and said something like, "I never fucking fired you from dispatch, that's a fucking lie."  (Nesvold Depo. (dkt. #36) 59.)  Roland also yelled, "I told you not to fucking talk to anybody" regarding the consolidation issue.  (Affidavit of Terry R. Nesvold ("Nesvold Aff.") (dkt. #44) ¶ 29.)

Nesvold allegedly was sitting at that time, with Roland standing.  Roland then approached him and, from approximately two feet away, pointed his index finger within inches of Nesvold's face.  Nesvold then stood up, took a defensive posture, and responded, "Dean, you did.  You did fire me, that's the word you used."  (Nesvold Depo. (dkt. #33) 61-62.)

Roland was in Nesvold's office for approximately three to five minutes, during which he again reiterated that Nesvold should not discuss the proposed consolidation with anyone, remained "hot," and continued to berate and swear at Nesvold.  (*Id.*)  Defendants do not dispute the confrontation in Nesvold's office on November 29th, except that Roland testified at his deposition that he stood at the office door the whole time.

After Roland left Nesvold's office, he approached the elevator, allegedly pounding on the glass windows by the elevator three to four times.  Roland then yelled at Nesvold something to the effect of, "Nesvold, my office now."  (*Id.* at 64.)  Nesvold then walked

toward the elevator.  While they waited for the elevator, Roland continued to yell at Nesvold in a loud voice with his hands up.  Nesvold again took a defensive position, fearing that Roland was going to punch or shove him.  Thomas Howe, a jail officer, testified at his deposition that he observed this "very heated discussion," characterizing Roland as "very agitated" and Nesvold as on the "defensive, like he really wasn't sure what was going to happen next."  (Deposition of Thomas Howe ("Howe Depo.") (dkt. #39) 7.)  Howe also testified that Roland was waving his hands at Nesvold, his face was "grimacing" and "red," and that Roland's body posture was "intimidating."  (Id. at 8.)  Howe testified that he remained close out of concern that Roland was going to shove or punch Nesvold, and that he would need to protect Nesvold.  (Id. at 9.)

Nesvold and Roland rode the elevator together, at which time Nesvold asked Roland what he did wrong.  After they got off the elevator, Roland and Nesvold walked toward Roland's office, at which time Roland yelled at Chief Deputy Burns to get into his office.  With all three in Roland's office, Roland continued to yell at Nesvold about not talking to the Board, picked up a box containing statute books from his desk and threw the box toward his office wall, with the box hitting the wall and then the floor.  Nesvold was standing approximately three feet from Roland when he threw the box away from Nesvold.  Roland then approached Nesvold and continued to yell at him at the top of his lungs.  Roland's hands were again at Nesvold's face and Roland's face was red.  Nesvold once again took a defensive posture.[5]

---

[5] Plaintiff submits additional facts about others in the office being scared and intimidated by Roland, and an anonymous person submitting a complaint about the November 29, 2012, incident.  (Pl.'s PFOFs (dkt. #43) ¶¶ 60-66, 105-119.)  Plaintiff also submitted

Roland eventually advised Nesvold that while Anton was the supervisor of dispatch, he was her supervisor, responsible for supervising her work. The parties dispute whether they resolved their disagreement in Roland's office, but it is undisputed that Roland and Nesvold shook hands at the end of this so-called meeting. Later that day, Nesvold sent an email to McLain advising him that Roland had reinstated Nesvold's dispatch supervisor duties.

At his deposition, Nesvold was asked about his job activity between November 20 and November 29, 2012. Initially, Nesvold testified that during this nine-day period, there was nothing that he normally would have done that he did not do. (Nesvold Depo. (dkt. #33) 96-97.) In apparent contradiction, Nesvold then testified that he was "afraid to do anything in dispatch," and that he "stayed away from all of it." (*Id.* at 97-98.)

Following the November 29 incident, Nesvold continued to work his normal shifts, and sought no medical attention relating to his interactions with Roland. Still, Nesvold contends that he suffered bodily harm in the form of sleep deprivation, emotional distress, anxiety, upset stomach, nausea, and high blood pressure, and was prescribed Ambien.

---

evidence of Roland's role as a policymaker within Burnett County. (*Id.* at ¶ 121.) The court need not recount these facts in light of its decision that Roland is entitled to qualified immunity with regard to the federal claims against him. Therefore, there is no need to reach the question of whether plaintiff has raised a genuine issue of material fact as to the County's liability under *Monell v. Dep't of Social Servs., City of New York*, 436 U.S. 658 (1978).

### G. Continued Communications with Board Supervisors

Despite Roland's repeated orders, Nesvold continued to have meetings with and send emails to County Board Supervisors regarding the proposed consolidation in January of 2012.  Among other things, Nesvold supplied information about the proposed consolidation in his possession as the Burnett County Jail Administrator, as well as other information to which he had access from the jail administrator e-mail listserv, and provided his views on how the Burnett County dispatchers were performing their jobs. On Monday, January 28, 2013, while on duty, Nesvold began drafting a letter on his work computer to the Burnett County Board Supervisors after listening to the audio of a Board meeting discussing consolidation.  In the letter, Nesvold expresses concern that the Board has not contacted him to discuss the planned consolidation:  "No one knows better than I what actually takes place upstairs, but no one ever asks me for what it may add to the discussion."   (Deposition of Dean W. Roland ("Roland Depo."), Ex. 1 (dkt. #31-1).)  Nesvold's draft letter also posed questions about assumptions concerning cost savings, safety issues, and urges the Board to ask the right questions.  (*Id.*)  Nesvold testified that he did not mail the letter immediately because he feared being fired.

Nesvold drafted a second letter to Board Supervisors at his wife's business on February 7, 2013, after the Board's Administration Committee voted to recommend the proposed consolidation to the full County Board.  In this letter, Nesvold again complained about his lack of involvement in the decision-making process, characterizing it as "disturbing that I have never been involved in any meetings" and stating that he "decided that I need to give you folks a little insight."  (Nesvold Depo., Ex. 13 (dkt. #33-

11

5).)   Nesvold then attempts to correct certain "misconceptions" about how the Burnett County Dispatch Center operates, whether consolidation is actually a trend in this state, and described certain risks of consolidation.   (*Id.*)

On or around February 7, 2013, Nesvold mailed both letters, a copy of his budget and an email he had received from the Outagamie County Jail Administrator to all of the County Board Supervisors at their home addresses.   Nesvold printed the letter on plain paper from his wife's business, the Copy Shop, and paid for the envelopes and postage himself.   The letters were not mailed through the Sheriff's Department.

During his deposition, Nesvold testified that his purpose in writing the letters was to address factual inaccuracies that Roland and others were conveying to the County Board.   Nesvold believed that the consolidation "was going to impact safety and service [for the citizens of Burnett County] . . . not to mention the tax dollars that it was going to cost."  (Nesvold Depo. (dkt. #33) 52.)   The information and facts Nesvold conveyed in the letters were based on knowledge he gained as part of his job as the Burnett County Jail Administrator.   Nesvold concluded the February 7th letter by stating, "I would not be doing what I was hired to do, without at least saying what needs to be said."  (Roland Depo., Ex. 1 (dkt. #31-1); *see also* Nesvold Depo. (dkt. #33) 132 (similarly conceding during his deposition that he felt that "saying what needs to be said" was something that he was hired to do).)   He then signed the January 28th letter, "Terry Nesvold, Jail/Dispatch Administrator."  (Nesvold Depo., Ex. 13 (dkt. #33-5).)

**H. Nesvold's Resignation**

On February 21, 2013, the Burnett County Board voted not to consolidate the Burnett County Dispatch Center with the Polk County Dispatch Center.  The next day, Nesvold met with Sheriff Roland and Chief Deputy Sheriff Burns.  That meeting was electronically recorded.  Burns told Nesvold that because the Dispatch Center was not going to be consolidated with Polk County, they were going to make a number of changes within the Sheriff's Department to improve operations, and that Nesvold was going to need to be recertified, which required that Nesvold attend "jail school."  Burns specifically mentioned one school taking place in March 2013, in Fennimore, Wisconsin, approximately 258 miles away from Nesvold's home.  Burns told Nesvold that he would also need to coordinate training for the dispatchers and take part in that training as well.  Finally, Burns told Nesvold not to talk to the County Board Supervisors about the orders Nesvold received.  Nesvold told Burns and Roland at the meeting that he was going to comply and get recertified, although he sobbed and cried uncontrollably upon returning to his own office.

The following Monday, February 25, 2013, Nesvold sent an email to Burns and Roland raising concerns about attending jail school in March.  (Nesvold had worked as a Jail Administrator since 2003 without being certified as a jailer.)  Burns responded, affirming the order that Nesvold attend jail school to obtain recertification and attached the registration materials to his response.

On February 28, 2013, Nesvold sent an email to Burns and Roland stating:

> I have not registered for school, and I have no intention of registering, as it is NOT the right time to do this as I stated

13

> before. Because of your new found love for trying to micromanage me all of a sudden, and believing you can run this jail/dispatch center better than I, my resignation will be on your desk early Monday morning, March 4, 2013.

(Nesvold Depo., Ex. 17 (dkt. #33-9).)

Later that day, Nesvold briefly met with Burns and Roland. Burns told Nesvold that they were accepting his resignation. Nesvold responded that he wanted to work for another couple of weeks, but Burns stated that his resignation was being accepted that day. Nesvold was nevertheless paid through March 22, 2013.

Nesvold understood from other terminations that the Law Enforcement Committee of the County Board would need to approve termination of employment. Nesvold's understanding is consistent with the Burnett County Human Resources Policy Manual. As such, Roland did not have the unilateral authority to terminate Nesvold's employment. At no time did Roland ask either the Law Enforcement Committee or the Human Resources Director for approval to terminate Nesvold's employment. Roland also avers that he did not desire to terminate Nesvold's employment before his resignation, though Nesvold disputes this claim based on Roland's actions leading up to his resignation.

Nesvold was not employed under an individual employment contract or collective bargaining agreement. Nesvold filed a grievance with the County on March 27, 2013, attempting to challenge his resignation. Under the Burnett County's Grievance Policy and Procedure, if an employee can prove by clear, convincing and substantial evidence that the County's decision to discipline or terminate his employment was "arbitrary or capricious," the impartial hearing officer must sustain the grievance and award the

grievant a remedy of reinstatement, a lesser adverse employment action, or reduction in suspension.  (Roland Aff., Ex. 6 (dkt. #37-6).)  Under the policy, an impartial hearing officer does not have the authority to award future lost earnings or front pay.

Burnett County's Grievance Policy requires that a grievance relating to discipline or termination be initiated by presenting a written complaint to the Human Resources Director within 10 days of the event giving rise to the grievance.  The Human Resources Director denied Nesvold's grievance as untimely, a decision that the Burnett County Administration Committee ultimately affirmed.

OPINION

In his amended complaint, Nesvold originally asserted five causes of action, but withdrew two of the claims after conceding that they were barred by Wisconsin's Workers Compensation Act.  Defendants seek summary judgment on the remaining three claims:  (1) retaliation under the First Amendment of the United States Constitution; (2) violation of his Due Process rights under the Fourteenth Amendment relating to his resignation from employment with Burnett County; and (3) a state law claim for assault.

## I.  First Amendment Retaliation Claim

To state a claim for retaliation under the First Amendment, Nesvold must prove that: (1) he was engaged in a constitutionally protected activity; (2) he suffered a deprivation that would likely deter a person from engaging in the protected activity in

the future; and (3) the protected activity was a motivating factor in defendant's decision to take retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)). If the plaintiff makes this initial showing, then the burden shifts to the defendant to demonstrate that he would have taken the same actions "even in the absence of protected conduct." *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011). Since there is little doubt that a reasonable trier of fact could find Nesvold's communications with County Board Supervisors motivated Sheriff Roland's conduct, defendants' motion for summary judgment turns on the first element -- whether Nesvold's communications were constitutionally protected activity. Surprisingly, the answer to this question is somewhat unsettled, even though Nesvold's speech was to publicly-elected officials.

"The inquiry into the protected status of speech is one of law, not fact." *McArdle v. Peoria School Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013) (citing *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007)). "Speech is constitutionally protected if (1) the employee spoke 'as a citizen on matters of public concern' and (2) his interest in commenting upon those matters outweighs the employer's interest in promoting the efficiency of its services." *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 861-62 (7th Cir. 2010) (quoting *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009)). "When employees make statements 'pursuant to their official duties,' they are not speaking 'as citizens' for First Amendment purposes." *Swearnigen-El*, 602 F.3d at 862 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). In determining whether speech is made pursuant to the plaintiff's official duties, courts tend to focus on two inquiries:

16

(1) was the intended audience internal or external to the plaintiff's employment; and (2) how did the speech relate to the plaintiff's job duties?

### A. Relationship to Job Duties

Taking them out of order, "[d]etermining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008); *see also Fairley v. Andrews*, 578 F.3d 518, 523 (7th Cir. 2009) (citing *Garcetti*, 547 U.S. at 424-25) ("Yet *Garcetti* is not limited to tasks officially assigned to an employee. Ceballos himself did not have a duty to make the report, or include the accusations, that got him into trouble; communicating with his superiors was simply within the general ambit of his job.").  Here, Nesvold admits that his job entails setting policy and procedures for the jail and dispatch center, acting as a liaison to other governmental entities, and attending meetings, among other duties.  Responding to Board Supervisors' questions -- whether in his office or outside of his office -- about a policy decision directly impacting Nesvold's role overseeing the Dispatch Center falls within the ambit of Nesvold's job.  In those one-on-one communications, Nesvold unquestionably conveyed information he learned on the job, using job resources.[6]

In opposing summary judgment, Nesvold focuses on the unsolicited nature and content of the letters sent to all Board Supervisors.  First, the fact that his letters and

---

[6] Nesvold would make much of the fact that some of his correspondence was made from his wife's office, using her computer, paper and other resources, but the *information* he was conveying, the truly valuable resource, was a product of his job.

communications were unsolicited is not dispositive as long as their content falls within the ambit of his job duties. *See Fairley*, 578 F.3d at 523 (holding that speech "need not be expressly commanded by an employer" to fall outside of the protection of the First Amendment). Second, the fact that Nesvold's speech occurred in defiance of an order from his direct supervisor does not mean that it falls within the protection of the First Amendment. In *Fairley*, the court considered whether the plaintiff's breaking of a "code of silence" with regard to reporting misconduct by fellow prison guards fell outside of the ambit of his job duties. *Id.* at 522. The court explained that:

> If an employer has instructed the workers to keep their mouths shut during working hours on questions related to performance of their (and co-workers') jobs the first amendment does not prevent the employer from enforcing that requirement. Whistle-blower protection statutes or labor law might provide a remedy . . . , but the Constitution does not.

*Id.* at 523.

As described above in more detail, Nesvold's letters expressed his frustration with not being included in the discussions concerning consolidation as the Jail Supervisor, posed questions for the Board to consider, and provided information about the current operations to better inform a policy decision. As such, the content of his speech is the direct product of his position as the Jail Administrator, an employee of Burnett County, and not simply a citizen concerned about safety and costs. Perhaps most telling, Nesvold himself viewed, and repeatedly characterized, his speech as compelled by his position. (*See, e.g.,* Roland Depo., Ex. 1 (dkt. #31-1) (concluding his February 7th letter by stating,

"I would not be doing what I was hired to do, without at least saying what needs to be said").)

Moreover, the vast majority of Nesvold's criticism concerned information and data being provided by the Sheriff's Office to County Board Supervisors about dispatch services under his supervision. Even the claims of "wrongdoing" that Nesvold would in particular have the court grant First Amendment protection here, goes to claims of misinformation about those dispatch services.

### B. Intended Audience

The second part of the inquiry largely concerns whether the speech is internal or external to Nesvold's employment. Consistent with other circuits, the Seventh Circuit tends to hold that speech directed to individuals internal to a public employee's job is not protected, whereas speech directed to individuals external to the employee's job is protected. *Compare Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 672 (7th Cir. 2009) (expressing concern to a member of the public about government waste was protected), *with Ogden v. Atterholt*, 606 F.3d 355, 360 (7th Cir. 2010) (concluding that employer's complaint to "ultimate supervisor" asking for department to be reorganized was not protected). While useful, this distinction is hardly a bright-line rule. *See Garcetti*, 547 U.S. at 420 (noting the internal nature of the speech was "not dispositive").

Plaintiff points to a line of cases holding that speech to elected officials complaining about misconduct is protected, including his communications to elected County Board Supervisors about the proposed consolidation of county dispatch services.

19

For example, in *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), the plaintiff, a corrections officer in a state prison, complained to the State Office of the Inspector General and to her state senator about being sexually harassed by several inmates.  The Ninth Circuit held that the plaintiff's "right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee," and concluded that "it was certainly not part of her official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly . . . . Rather, it was [the plaintiff's] responsibility as a citizen to expose such official malfeasance to broader scrutiny."  *Id.* at 545; *see also Morales v. Jones*, 494 F.3d 590, 597 (7th Cir. 2007) (discussing *Freitag* favorably); *Houskins*, 549 F.3d at 491 (same).

There are a number of problems with plaintiff's application of this case to his situation, beginning with the difference between the kinds of wrongdoing -- sexual harassment, malfeasance, and other criminal activity -- that fall wholly outside of the ordinary duties and job description of the complaining employee.  The Seventh Circuit has also recognized that complaining to elected officials, even about misconduct, is not always protected conduct under the First Amendment.  In *Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008), the Seventh Circuit considered whether the Interim Administrator of the Illinois Gaming Board was engaged in protected conduct in testifying before the State of Illinois House Gaming Committee.  The court held that "reporting alleged wrongdoing to those with the responsibility for legislative oversight should be governed by the same principle" as "reports to superiors concerning alleged wrongdoing in their

20

government office." *Id.* at 1091-92.  In so holding, the Seventh Circuit acknowledged that courts "must take into account the employee's level of responsibility." *Id.* at 1092.

### C. Qualified Immunity

While Nesvold arguably has far less oversight responsibility than the Illinois Interim Administrator of Gaming in *Tamayo*, the court must also consider the relative position of the Burnett County Supervisors as compared with an Illinois Legislature's Oversight Committee.  Certainly, Nesvold had oversight responsibility for the Dispatch Center.[7]  As described above, the record also demonstrates that it was within the ambit of Nesvold's job to meet with Board Supervisors, answer their questions, and even send unsolicited letters offering factual information and voicing his opinions on dispatch operations, safety concerns, and budget issues.  Indeed, it was this part of his job that Sheriff Roland repeatedly ordered Nesvold to curtail when it came to the subject of consolidation of dispatch services.  Roland expressly defined the chain of command for reporting on this subject -- in effect saying, "all information on this subject will come through me."  If nothing else, Roland's command to remain silent on this subject had become one of Nesvold's job duties.[8]

---

[7] Although Nesvold claims that his oversight responsibilities were taken away by the Sheriff during a heated conversation, this was only after Nesvold had already disobeyed the Sheriff's directive not to speak with County Board Supervisors about dispatch services.  Moreover, even under Nesvold's version of the facts, his ultimate oversight responsibilities were later reinstated (or clarified, as the Sheriff would characterize it).

[8] Nesvold does not directly challenge the command itself as an impingement on his right to free speech, although one might argue it is implicit in a challenge to his being punished for exercising that "right."  Perhaps this is because such a challenge more starkly

In this regard, defendants point to a separate line of Seventh Circuit cases holding that speech to superiors is not protected conduct. *See Mills v. City of Evansville, Inc.*, 452 F.3d 646, 648 (7th Cir. 2006) (holding that police sergeant plaintiff's "discussion[s] with her superiors" about "the formation and execution of official policy" fell outside the protection of the First Amendment); *Swearnigen-El*, 602 F.3d at 862 (holding that correctional officer's "complaints to his superiors" about an announced policy to remove all correction officers from a female correctional facility were made pursuant to his duties); *Bivens v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010) (concluding that plaintiff's complaints about lead contamination "made directly up the chain of command to his supervisors are not protected by the First Amendment"). From those cases, defendants argue that Nesvold's in-person and email communications with Board Supervisors conveying factual information and letters complaining about his lack of involvement in the consolidation decision was not protected conduct.

While Nesvold points out that plaintiffs in a number of those cases were complaining to *direct* supervisors during their working hours (Pl.'s Opp'n (dkt. #41) 16), the Seventh Circuit has held that complaints directed beyond direct supervisors "up the chain of command" also fall outside of the protections of the First Amendment. *See, e.g.*, *Bivens*, 591 F.3d at 560; *Ogden*, 606 F.3d at 360. Arguably, at least, Nesvold's decision to

---

underscores the problem with his First Amendment claim. Except where public policies falling outside the responsibilities of an employee are at issue, a supervisor is generally permitted to restrict an employee from discussing matters known only because of their employment. *See Fairley*, 578 F.3d at 523 ("The purported code of silence is a ban on filing complaints about guard-on-inmate violence. Such a policy might be foolish; it might expose the County to other lawsuits; but it does not offend the first amendment[.]"). Whether this is ultimately the best *policy* in a free society, it appears to be the current state of federal constitutional law.

go up the chain of command from his direct supervisor, Sheriff Roland (who was after all an elected official as well), to his bosses, the Board Supervisors, is similarly outside those protections.

Still, the court agrees with plaintiff that the cases cited by defendants contain a cleaner set of facts than those presented here.  While the record indicates that the Board played a pivotal role in Nesvold and other county employees' job duties -- requiring Board approval to create a new position and to terminate employment -- there remains at least some uncertainty as to whether the Board Supervisors can properly be characterized as Nesvold's supervisors, particularly as elected officials for whom Nesvold has an unquestioned right to speak about matters of policy falling outside his work duties. Moreover, Nesvold's complaints about the Sheriff's "gag order," without discussing the substance of dispatch consolidation, may well have been protected, especially when solicited by a Board Supervisor.

Unlike other cases involving speech to elected officials, however, Nesvold was not simply expressing his opinion about policy, but rather was criticizing the Board Supervisors for not affirmatively seeking out his knowledge and opinions as a long-standing employee charged with supervising the County Dispatch Center, and then offering both in direct violation of Sheriff Roland's directive.  Moreover, if the Board Supervisors had a problem with that directive, they obviously could have overridden it, at least where, as here, some Supervisors had been apprised of it.  Indeed, Nesvold himself presumably had an option of taking this dirty laundry public by way of a letter to the editor or other public speech.  *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391

U.S. 563, 573 (1968) (public school teacher's letter to the editor protected under First Amendment). The fact that he chose to keep it internal to Board Supervisors to whom the Sheriff directly reports is telling. At the very least, Nesvold has not carried his burden of demonstrating that the content of his speech to the Board Supervisors was like that of an ordinary citizen.

While there are ample cases describing the First Amendment rights of public employees, there is not a specific case addressing the facts at issue here. Assuming for the sake of summary judgment that Nesvold was complaining about serious wrongdoing (blatant misrepresentations of facts by the Sheriff material to the Board's decision on consolidation), Nesvold's claim seems to fall at the intersection of two lines of cases with diverging results: (1) cases where a plaintiff is complaining about wrongdoing up the line of command, internal to his employment; and (2) cases where a plaintiff complains about wrongdoing to elected officials, external to his employment. While Nesvold's conduct would seem to fall more neatly into the first line of cases, the implications of that holding is troubling, if not on the facts here, then on a foreseeable, arguably similar set of facts.

In light of this uncertainty, the court need not determine definitively whether Nesvold's speech is protected or not. *See Pearson v. Callahan,* 555 U.S. 223, 236 (2009) (holding that courts may skip the first step of *Saucier v. Katz,* 533 U.S. 194 (2001), and only address whether the right was "clearly established" at the time of the alleged violation)). Instead, the court finds that defendant Roland is entitled to qualified immunity because it was not clearly established that Nesvold's decision to speak in detail to the County Board Supervisors about dispatch services in direct violation of his boss's

24

directive was protected conduct at the time Roland retaliated against him, nor that Roland's at best ham-handed attempts at discipline was sufficiently extreme to chill Nesvold's legitimate speech.

"To qualify as 'clearly established,' the right must be 'particularized' in the sense that '[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right.'" *Chrzanowski v. Bianchi*, 725 F.3d 734, 742 (7th Cir. 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Here, as described in detail above, there is no case placing an elected official in Roland's position on notice that speech to elected members of a County Board, who themselves are his supervisors, by an employee reporting directly to him on a specific subject falling squarely within a report's job duties, constituted protected conduct under the First Amendment such that it could neither be restricted nor disciplined. *See Chaklos v. Stevens*, 560 F.3d 705, 716 (7th Cir. 2009) (concluding that defendants were entitled to qualified immunity in First Amendment retaliation claim where plaintiff's "entitlement to First Amendment protection [was] not obvious").[9]

Finding no clear constitutional violation by defendant Roland, the court need not consider whether plaintiff has put forth sufficient facts from which a reasonable jury could find Burnett County liable under *Monell*. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997) ("Neither the City nor the police officers' supervisor

---

[9] While Roland is entitled to qualified immunity, this finding should not be seen as a vindication for either plaintiff or defendant, whose conduct -- at least for the purposes of summary judgment -- depict unruly and tantruming toddlers, respectively, rather than mature, public servants.

can be held liable on a failure to train theory or on a municipal policy theory absent a finding that the individual police officers are liable on the underlying substantive claim.").

## II. Due Process Claim

Plaintiff also asserts a due process claim under the Fourteenth Amendment of the United States Constitution.  To succeed on such a claim, Nesvold concedes that he must first prove a "legitimate claim of entitlement" to his job under state law.  (Pl.'s Opp'n (dkt. #41) 32 (quoting *Bd. of Regent of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).)  To do this, "a plaintiff is generally required to show that the terms of his employment provide for termination only 'for cause' or otherwise evince 'mutually explicit understandings' of continued employment."  *Cole v. Milwaukee Area Tech. College Dist.*, 634 F.3d 901, 904 (7th Cir. 2011).  Whether Nesvold had a property interest in continued employment depends on state law.  *See Redd v. Nolan*, 663 F.3d 287, 296 (7th Cir. 2011).  Moreover, the question of whether a public employee has a protected property interest in employment is also a question of law.  *See Cole*, 634 F.3d at 904.

Plaintiff posits two core arguments in support of his claim that he was not an at-will employee.  First, plaintiff argues that "[a]fter employees' rights to collectively bargain were all but eliminated, the Wisconsin Legislature enacted Wis. Stat. § 66.0509 requiring all municipalities to establish a grievance procedure to address 'employee discipline' and 'employee termination.'"  (Pl.'s Opp'n (dkt. #41) 33.)  Second, plaintiff argues that Burnett County's grievance process directs an impartial hearing officer to order

26

reinstatement (or some other remedy) if the employee can prove "by clear, convincing, and substantial evidence that the County's decision to discipline or terminate the employee was 'arbitrary or capricious.'"   (*Id.* at 33-34 (citing Roland Aff., Ex. 6 (dkt. #37-6).)

Unfortunately for plaintiff, "a promise that certain procedures would be available . . . before termination . . . do not provide the substantive restrictions on the employer's discretion that would be needed to establish a federally-protected property interest in continued employment." *Redd*, 663 F.3d at 298 (citing multiple cases supporting this proposition). Neither the Wisconsin Statute nor Burnett County's grievance policy provide the substantive restrictions necessary to transform Nesvold's employment into one which could be terminated only for cause. "[U]nder Wisconsin law, a dichotomy exists between employment 'at-will' and employment which can be terminated only 'for cause.'" *Cole*, 634 F.3d at 904 (quoting *Beischel v. Stone Bank School Dist.*, 362 F.3d 430, 436 (7th Cir. 2004)).

Moreover, only those employees whose employment falls within the "for cause" category receive due process protections. *Id.* Even where the employment falls in the "gray area" between the "two poles," there is no legitimate expectation in continued employment to give rise to a property interest, and in turn, due process rights. *Id.* Here, even if the Wisconsin statute requiring a grievance process and Burnett County's implementation of one moved Nesvold's employment out of the "at will" pole, there is no evidence of terms limiting his employer's discretion to terminate his employment only for cause. *See Kvapil v. Chippewa Cnty., Wis.*, 752 F.3d 708, 713 (7th Cir. 2014)

27

("Wisconsin has a strong presumption in favor of employment at-will." (quotation marks and citation omitted)).

Plaintiff's due process claim fails for yet another reason. As plaintiff implicitly concedes, the County *does* have a grievance process which meets the requirements of *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985). *Id.* at 541 (describing three due process requirements of notice, employer's explanation and opportunity for employee to tell her or her side of the story).[10] Burnett County Policy 1.02 sets forth a process by which an employee may submit a grievance, receive notice of the County's initial response to the grievance, and if the relief requested in the grievance is denied, an opportunity for a hearing in front of an impartial hearing officer where an employee may present evidence and question witnesses. (Roland Aff., Ex. 6 (dkt. #37-6).) Here, Nesvold attempted to engage in that process, but failed to submit his grievance within the time allotted. *See Hinojosa v. U.S. Postal Serv.*, 250 F. App'x. 350, 352, 2007 WL 2945685, at *2 (Fed. Cir. Oct. 9, 2007). ("She enjoyed all the rights that an uninjured employee would have had-in this case, the right to internal due process protections and the right to grieve her removal. She simply failed to pursue her grievance rights on a timely basis.").

Still, Nesvold persists that the grievance procedure outlined above "does not provide Nesvold with any meaningful process to challenge the claimed deprivation,"

---

[10] The court notes that Burnett County's grievance policy does not require *pre*-termination notice and hearing, but plaintiff does not fault the policy on that basis; nor could he, given that his claim rests on a constructive discharge theory, rather than a straightforward termination.

28

because Nesvold does not want his job back, rather he wants future lost earnings or front pay, which the impartial hearing officer lacks authority to provide.  (Pl.'s Opp'n (dkt. #41) 36.)   The fact that it does not provide *all* of the relief Nesvold now requests, however, does not mean that the procedure fails to satisfy the requirements of due process.   *See Germano v. Winnebago Cnty., Ill.*, 403 F.3d 926, 929 (7th Cir. 2005) (discussing *Parratt v. Taylor*, 451 U.S. 527, 544 (1981), *overruled in part on other grounds by Daniel v. Williams*, 474 U.S. 327 (1986)).


### III. State Law Assault Claim

Having dismissed Nesvold's federal claims, the court will decline to exercise its supplemental jurisdiction over his legally and factually distinct state assault claim, dismissing that remaining claim without prejudice.  *See Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) (explaining that when a district court dismisses a plaintiff's federal law claims, "the presumption is that the court will relinquish federal jurisdiction over any state law claims").


ORDER

IT IS ORDERED that:

1) defendants Burnett County and Sheriff Dean W. Roland's motion for summary judgment (dkt. #34) of plaintiff's First Amendment Retaliation and Due Process claims is GRANTED;

2) plaintiff's state law assault claim is dismissed without prejudice; and

3) the clerk of court is directed to enter judgment in favor of defendants as described in ¶ 1 and dismiss this case.

Entered this 17th day of December, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge